1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gregory P. Goonan (Cal. Bar #119821)
**The Affinity Law Group APC**
600 West Broadway, Suite 400
San Diego, CA  92101
Tel:  619-702-4335
Fax:  619-243-0088
E-Mail:  ggoonan@affinity-law.com

Specially Appearing as
Attorneys for Defendants
Donald D. Hughes and
Right Connection, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LSO, Ltd., a California corporation,<br><br>        Plaintiff,<br><br>   vs.<br><br>Donald D. Hughes; Right Connection, Inc., a Nevada Corporation; and DOES 1 through 20 inclusive,<br><br>        Defendants. | Case No.  08CV0329 H (LSP)<br><br>**DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND WRIT OF POSSESSION**<br><br><br>Date: March 17, 2008<br>Time:  10:30 am<br>Court:  13 (Hon. Marilyn L. Huff) |

I, Donald Hughes, state as follows for my declaration:

1.  I am a resident of the State of Arizona and currently the President of defendant Right Connection, Inc., a Nevada corporation ("Right Connection").

2.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

<u>Right Connection's History and Business</u>

3.  Right Connection is a company specializing in web hosting, collocation services, credit card processing, custom applications programming, affiliate sales and adult travel destinations. Right Connection is renowned in the alternate lifestyle industry for the creation of custom programming for "Personals Profile Engines" and the sale of adult travel with superior online reservations engines.

4.  The technical expertise of the company is unsurpassed in our field. Right Connection has presented some of the most sophisticated software for credit card processing, personals profile engines and online travel reservations.  With our roots back to 1995, at the inception of the Internet as a commercial and personal gathering media, Right Connection was the founder of a number of alternate lifestyle personals websites, "chat" websites, and affiliate sales programs. These programs offer to the alternate lifestyle demographic the sale of products and services to this niche demographic of couples.

5.  Right Connection began selling adult travel in 1997 after meeting a couple that owned a company called Castaways Travel.  Right Connection introduced this company to Internet marketing and helped make the company what it is today, one of the largest online agencies for alternate lifestyle travel.

6.  From 1995 through 2002, Right Connection enjoyed substantial sales of travel and adult toy products to the customers of this niche lifestyle.  Right Connection hosted large groups of couples to destinations in Jamaica for superior adult vacations.  Right Connection also processed orders for adult toys and enhancement products through a company called Connection

1  Distribution, and adult travel through Castaways Travel.  Both of these companies willingly paid

2  Right Connection commissions for these sales.

3       7.  As part of its business, Right Connections has registered service marks and also owns,

4  maintains and uses numerous common law trademarks including but not limited to Right

5  Connection, Right Connect, Connections, Right Connections Travel, Desire-Resort,

6  (understanding the "Desire Resort" actually is owned by the resort chain under the same name,

7  with Right Connection being granted rights by the resort to use the Desire Resorts name and logo).

8       8.  As a consequence, Right Connection's name has become the standard in the alternate

9  lifestyle for building superior personal booking engines and providing excellent adult travel

10  destinations.

11  Right Connection's Customer and E-Mail List

12       9.  As a result of Right Connection's activities, reputation and position in the market place,

13  and with the assistance of numerous fully operational websites and marketing sites, Right

14  Connection has developed its own massive e-mail contact list of well over 125,000 e-mails

15  addresses.   Indeed, Right Connection is so well respected in the industry that e-mails sent from

16  our servers are not blocked as SPAM mail in most of the largest online networks.

17

18  Right Connection's Dealings With Plaintiff

19       10.  In 2001, Plaintiff's principal Robert McGinley (who was attending a swinger

20  convention hosted by Mr. McGinley) asked Right Connection to assist Plaintiff with the creation

21  of an Internet personals and chat website.  Right Connection already had developed such an

22  "engine" for the very first personals website on the Internet (the "International Couples Network")

23  as well as for a very successful alternate lifestyle website called "ConnecitonOnLine."

24       11.  Right Connection agreed to assist Plaintiff but the parties ultimately failed to complete

25  a contract.  After Right Connection had spent over $2000.00 on art work and site designs, Plaintiff

26  informed Right Connection t had decided to give the job to Barbara & Paul Murray (the current

27

28

---

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S*
*MOTION FOR TRO AND WRIT OF POSSESSION*

attorney for Plaintiff and his wife).  Apparently, Mr. Murray's wife at the time owned and operated a website design firm.

12.  By 2002, Plaintiff and Barbara Murray had failed miserably in their attempt to create a website (which was to be called "ClubLifestyles") that was up to the standard for the period. Indeed, I have learned that Mrs. Murray attempted to copy and re-create a then-copyrighted unique photo-chat program originally designed by Right Connection, which of course was an infringement of Right Connection's rights.

13.  Given Mrs. Murray's failure to develop a suitable website for Plaintiff, Mr. McGinley asked David Valentiner, his webmaster and technical manager for many years, to see if Right Connection would consider taking the project back and completing the website.  Right Connection was very skeptical of working with Mr. McGinley because we found him less than trustworthy, but Mr. Valentiner convinced Right Connection the new CEO of the company, Dixie Kinnee would be better to work with and not take advantage of the Right Connection.

14.  Submitted herewith as Exhibit A is a statement from Mr. Valentiner that describes in more detail the history and dealings between Right Connection and Plaintiff.

15.  Right Connection agreed to assist Plaintiff in December of 2002, but only pursuant to a written contract which would set forth the exact details of the parties' obligations. The contract was to spell out the requirements of each party, deal with control issues, and clarify that Right Connection owned the intellectual property rights to its software and art work.

16.  Submitted herewith as Exhibit B is a true and correct copy of the contract between Plaintiff and Right Connection regarding the work that Right Connection was going to do for Plaintiff.  Frankly, we did not trust Plaintiff and Mr. McGinley so we tried to spell out in the contract every detail of the parties' agreement, even down to the administrative control over the relevant domain names.

---

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

1

<u>Initial Use Of The clublifestyle.com Website</u>

2

17.  Right Connection created the ClubLifestyles website as expected, in the amount of

3

time it was expected to be completed in.  Right Connection needed to obtain a credit card

4

processing account for accepting payments from customers. Since banks do not like adult

5

businesses, Right Connection used the second domain name that it registered for Plaintiff's

6

website -- clublifestyle.com -- to create a non-adult looking website the bank could review in

7

determining if we were allowed to accept credit cards.

8

18.  A screen capture of the initial clublifestyle.com website that we used to get a credit

9

card processing account is submitted as Exhibit C.

10

19.  The important point is that, contrary to the suggestion in Plaintiff's papers, Right

11

Connection did not create the clublifestyle.com website or register the domain name to divert

12

business from Plaintiff or infringe Plaintiff's intellectual property rights.  In fact, the parties'

13

contract (Exhibit B) specifically provided that Right Connection would have ownership and

14

control of the clublifestyle.com domain name during the term of the contract.

15

20.  After we used the generic clublifestyle.com website to obtain the credit card

16

acceptance account, we reprogrammed the clublifestyle.com domain name to redirect users to

17

Plaintiff's main site at clublifestyles.com.

18

21.  Plaintiff's webmaster (David Valentiner) and Plaintiff's IT Manager (Bruce Kinnee)

19

both had access to the code for both the clublifestyles.com website and the clublifestyle.com

20

website.  Such individuals always had access to such code and continue to have access to such

21

code even today.  Both Mr. Valentiner and Mr. Kinnee had access to the website code because

22

they were responsible for the information that actually shows on the pages of the sites.

23

22.  To understand this idea a little better, let me explain a little bit more about the

24

operation of a site like clublifestyle.com or clublifestyles.com.  In a general sense, such websites

25

have two aspects – the "engine" that drives the website and causes the website to function and

26

27

28

operate from a technical perspective, and the actual content of the website, which is what a user sees when he or she visits the site.

23. As I noted earlier, Right Connection had a vast and longstanding expertise in creating the "engines" for websites, and that is what Right Connection did for Plaintiff here. Then, after the engine and supporting programming was created by Right Connection, it was up to the owner of the website to determine what content would be displayed on the website in terms of pictures, advertising banners, links, access to shopping sites, etc.

24. Here, it was Plaintiff that determined what content would be displayed on the clublifestyles.com website in terms of text and information about conventions, parties, houseboats trips and other products and services offered by Plaintiffs. Critically, all content that displayed on the clublifestyles.com website during the time Right Connection worked on such site, and later on the clublifestyle.com website (as discussed more below) <u>was placed on such websites by Plaintiff not Right Connection</u>.

<u>Defendants Have Not Stolen And Do Not Have Plaintiff's Customer List</u>

25. After Plaintiff's website was up and running as described above, Plaintiff asked Right Connection to process all of Right Connection's travel sales through Plaintiff instead of their competitor, Castaways Travel, so that Plaintiff's website would gain credibility.

26. Right Connection agreed to move their adult travel reservations to Plaintiff's Lifestyles Tours and Travel with provision we would be paid commissions on a timely basis. This was agreed to by LSO, and Right Connection was in fact paid for about a year even though we had to make frequent requests for payment.

27. It was the agreement of Plaintiff and Right Connection that the ClubLifestyles website would be promoted by Plaintiff (not Right Connection) as Plaintiff had a regular mailing they sent out concerning travel vacations to their customer base. At first, Plaintiff diligently advertised the ClubLifestyles website in many full color mailings, and as a part of all of their regular offerings.

---

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 6 -

28.  Critically, contrary to the suggestion in Plaintiff's papers, Plaintiff never provided Right Connection with any paper copy or physical copy of its customer list or mailing list. Likewise, Plaintiff never provided Right Connection with its e-mail list.  There would not have been any reason to do so because it was the duty by the contract for Plaintiff, not Right Connection, to do the promotions for the website.

29.  Moreover, as already described, Right Connection already owned its own massive e-mail list which undoubtedly contained many of the same names as Plaintiff's e-mail list given the nature of the adult alternative lifestyle market.  So there really would have been little or no value to Right Connection from gaining access to Plaintiff's e-mail list.

30.  Plaintiff's IT Manager has made a notation Plaintiff's Exhibit 4 that "in [his] opinion" Right Connection had Plaintiff's e-mail list.  Plaintiff's IT Manager does not know what he is talking about – his "opinion" is wrong and he is making an incorrect and unfounded accusation.

31.  In fact, the e-mail script referenced by Plaintiff in Exhibit 4 as a supposed example of cyber-piracy is a script written for and given to the IT Manager to help clean-up bad e-mail mail addresses, not capture a few e-mails from Plaintiff.  Moreover, Right Connection had no access to Plaintiff's new servers in any event, so there was no way for Right Connection to secretly place any such script in Plaintiff's code in any event.

32.  Instead, after the initial launch of the clublifestyles.com website, Right Connection actually provided Plaintiff's IT manager with Right Connection's e-mail list (not the other way around) so Plaintiff could clean up its list of old addresses and add Right Connection's list to Plaintiff's list to more effectively advertise the ClubLifestyles website.

33.  The agreement was for Plaintiff's IT Manager to clean Plaintiff's list, merge Plaintiff's list and Right Connection's list, and then give Right Connection a copy of the merged list. But this never happened.  Plaintiff took Right Connection's e-mail list and merged it with Plaintiff's list, but then never provided Right Connection with a copy of the merged master list.

34.  Given the foregoing, if anyone is guilty of misappropriating a customer list, it is Plaintiff not Right Connection.

### Clublifestyles Affiliate Sales

35.  Initially, Plaintiff greed that sales of merchandise by third party vendors would be offered on the ClubLifestyles website and all of the revenue from such sales would be distributed 50%-50% to compensate Right Connection for its work.

36.  With such agreement in mind, advertisements were placed for affiliate sales on the ClubLifestyles website for adult toys, videos and other items of interest to the customers of ClubLifestyles.

37.  Timely payment of travel commissions due to Right Connection continued to be an issue long after the website was rolled out.  Payments were slow, or non-existent and constant communications occurred between Plaintiff and Right Connection in regards to being paid.

38.  Indeed, after the website was rolled out, Plaintiff began to experience many problems paying their bills.  Checks and payments were promised, yet never materialized.  This continued to be a hot issue between Plaintiff and Right Connection, Inc., all the way to Right Connection now being a creditor in Plaintiff's bankruptcy proceeding.

### The Trip Cash Program

39.  Given Plaintiff's payment and cash flow problems, for the purposes of trying to generate more sales and more accurate tracking of commissions due to outside sales partners like Right Connection, we presented the concept of The Adult Travel Store / Trip Cash to Plaintiff. We believed that building an affiliate program like many other companies enjoy on the Internet would provide Plaintiff with a way to offer their travel opportunities to smaller companies and have accurate tracking of their sales for commission payments.

40.  With this in mind, Right Connection on Plaintiff's behalf located, contracted with and supervised two outside programmers to create a custom affiliate program for Plaintiff.   This

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 8 -

program was completed and placed for operations on Right Connection servers. The Trip Cash affiliate program was never placed on or operated from Plaintiff's servers.

41. Unfortunately, even with the new Trip Cash affiliate program, payment of commissions still was slow in coming and mostly not paid at all. In fact, from my perception, Plaintiff deliberately cheated most of the associated partners of the Trip Cash program and never paid them the commissions due to them.

42. Plaintiff used the program to lure in the smaller sales agencies, accepted the sales, collected the cash from the customers, but then never paid the affiliates. Plaintiff and Mr. McGinley adopted the policy if they recognized a customer name as previously traveling with or attending one of Plaintiff's events, they were the customer of Plaintiff no matter that they were making a travel purchase through an affiliate site and not Plaintiff's site. Plaintiff used this scheme to invalidate and avoid paying commissions on many affiliate sales.

43. Obviously, timely payment to the affiliates is crucial for the success of any affiliate program. Unfortunately, because of Plaintiff's tactics, the Trip Cash program – which had great potential at the beginning – was abandoned by most affiliates for non-payment of commissions and is virtually worthless today.

44. Since Plaintiff also was not paying Right Connection its travel commissions as agreed and expected, and the revenues of such travel sales commissions were an important part of the cash flow of Right Connection, we decided it would be best to open our own travel division. In this way, we could book travel ourselves and would not depend on anyone else to be paid the commissions due to them.

45. This new entity was called Right Connections Travel. Right Connections Travel's physical office is located 1055 E Tropicana Ave, Suite 525a, Las Vegas, NV 89119. Right Connections Travel is a legal "Seller of Travel" in the State of Nevada. [See Exhibit D.]

46. Right Connections Travel negotiated and successfully contracted for sales with several instrumental resorts including the Desire Resorts. These contracts infuriated Mr. McGinley and

Plaintiff did its best to interfere with the business of Right Connection by asserting pressure on the resorts not to do business with Right Connections Travel.    The resorts intelligently declined to accept Mr. McGinley's mistruths and Right Connections Travel continues to be a major wholesaler for the resorts.

<u>Revival And Current Status Of Clublifestyle.com Website/The Servers At Issue</u>

47.  The ClubLifestyles website faltered after its roll out, both from the lack of attention from Plaintiff and the failure by Plaintiff to use the ClubLifestyles site as a central media for all LSO goods and services, specifically an advertising forum for LSO vacations and conventions. Severe competition from other personals and alternative adult websites also was taking customers from Plaintiff and ClubLifestyles.

48.  The Clublifestyles website was rolled out as a pay site.  In other words, users of the site who wanted to chat, view personals, etc. had to pay a fee for use of the site.  Among the work performed by Right Connection for Plaintiff was the collection of user fees mainly through credit card charges.

49.  Given the poor performance of the site as a pay site, after several meetings with Plaintiff's CEO (Dixie Kinnee), her husband and now IT Manager of Plaintiff (Bruce Kinnee), and Right Connection, it was determined the best business model for ClubLifestyles to adopt would be a free-website business model.  This would give users a great place to play and hold potential travel customers on one site where they could easily have advertising directed to them.

49.  The ultimate agreement between Plaintiff and Right Connection was for Right Connection to finish out the year of 2005 collecting user fees, and then in year 2006, the site would become totally free to the members.  This would allow Plaintiff one full year before the roll out of the free site to exploit the media and determine if the operational costs of the website were worth the profits that might be extracted from travel sales to the captive audience.

50.  In the summer of 2005, Plaintiff's webmaster and IT Manager solicited Right Connection to see if we would be interested in the collocation (meaning the consolidation of

---

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 10 -

computer hardware, network equipment, servers, and switching equipment and peripherals in a central data center) of Plaintiff's websites and servers.   The plan was to have Right Connection purchase on behalf of Plaintiff two small servers to operate Plaintiff's websites.

51.  Reluctantly, Right Connection agreed to perform collocation services for Plaintiff's two servers for a predetermined price to be paid monthly.  Right Connection was not at all convinced we would be paid for our services but we went forward anyway.

52.  Critically, all of the information on the two servers purchased for Plaintiff (including all website content) was loaded and controlled by David Valentiner and Bruce Kinnee.

53.  As the one year period approached for the agreed expiration date for the free Clublifestyles website, Right Connection made numerous attempts to get Plaintiff to make a determination as to the fate of the ClubLifestyles website.  The choices were simple: (1) pay Right Connection to continue the operation of the site as a free site; (2) shut the site down; or (3) transfer ownership of the website to Right Connection, to allow Right Connection to continue with the free business model and allow Plaintiff to advertise on the website for free for its travel, conventions and sales of videos and clothing.

54.  Initially, Plaintiff chose Option No. 3, to turn over operation and monthly costs for the ClubLifestyles website to Right Connection.  [See Exhibit E, which is a true and correct copy of an e-mail from Bruce Kinnee confirming such agreement.]

55.  The new plan was to have Right Connection assume all of the costs for the monthly operation of the website.  The parties agreed that the website (including all programming, content, etc.) would be moved en masse to the clublifestyle.com domain name so Plaintiff could use the clublifestyles.com domain for other purposes.

56.  Under the parties' agreement, Right Connection could offer its own goods and services for sale on the free clublifestyle.com site, and Plaintiff likewise could advertise its products and services for free and also tell its customers they were still offering the website for free.  Plaintiff maintained the right of ownership to the domain name clublifestyle.com and the

right to free advertising of Lifestyles goods and services for swinger conventions, Lifestyles videos, and weekly swinger parties.

56.  Plaintiff gave Right Connection a deadline of midnight on January 26, 2007 to move the website from the clublifestyles.com domain to the clublifestyle.com domain.  Right Connection was give just two days to perform this very difficult task.  Nevertheless, the move was completed on time as ordered and the ClubLifestyles website (now located at clublifestyle.com) was fully operational on January 26, 2007.  Following such transfer, the clublifestyles.com domain name was to be designed by Bruce Kinnee to be used as a "portal site" for all of Plaintiff's businesses.

57.  Shortly thereafter, Plaintiff tried to repudiate the deal with respect to the website. However, the migration of the ClubLifestyles website to the alternate domain name of clublifestyle.com as ordered had already been completed.   Nevertheless, Mr. McGinley ordered the ClubLifestyles website returned to a pay-for-use site as it had been (unsuccessfully) before.

58.  Right Connection warned Plaintiff its strategy would be a disaster because the customers were promised a free media.  Right Connection then came to learn that Plaintiff expected Right Connection to continue to host and operate the ClubLifestyles website for free, even though we now had gone months past the expiration of the free period.  Right Connection declined this offer to continue to pay the expenses of the site and instead proceeded to migrate the website back to a pay site even though the site now had no paying members because of the lengthy free period of use.

59.  Right Connection removed the "free time" enjoyed by customers in February of 2007. The members profiles were all in the system and fully operational, except there was no way for them to use the features of the site without first paying for the use of the site.  However, since Right Connection had not been charging for the website for one year, Right Connection did not have a credit card acceptance account that could be used by the now for-pay ClubLifestyles website.

60.  Right Connection therefore asked Plaintiff for its credit card merchant account for use on the site as provided by the parties' agreement (Exhibit B).  Unfortunately, Plaintiff refused to provide a credit card merchant account as required by the contract between Plaintiff and Right Connection.  [See Exhibit F, which is a confirming e-mail regarding the need for Plaintiff to provide a credit card account.]

61.  Consequently, the newly migrated ClubLifestyles website remained online at the clublifestyle.com domain but with no members being able to use the website because of Plaintiff's refusal to provide the credit card merchant account.   Over a period of time, internal "house cleaning" scripts used by Plaintiff cleared out any profile that had not been accessed in 60 days or more.   Eventually, over the one year period between February 2007 and February 2008, the ClubLifestyles site became a ghost of what could have been a great site – it remains online and fully operational, but with no paying members.

62.  Of critical importance to the present proceeding, Plaintiff's webmaster Mr. Valentiner and its IT Manager Mr. Kinnee have full and complete access to all of the code for the clublifestyle.com website.  As confirmed by Mr. Valentiner's statement submitted as Exhibit A, all content currently displayed at the clublifestyle.com website was placed on such site by Plaintiff not Right Connection.  This is true of the Lifestyles logo about which Plaintiff complains so loudly.  And because of its access to all of the programming code for the site, Plaintiff can at any time make any changes it wants to the clublifestyle.com website content, including taking the website down altogether or deleting any content that Plaintiff does not want displayed on such website.

63.  Contrary to the accusation in Plaintiff's papers, Right Connection is not using the clublifestyle.com website to divert business or customers from Plaintiff to Right Connection.  Indeed, Right Connection could not do so because clublifestyle.com is now set up as a pay site but does not have any paying members for the reasons I have described.  Certainly, Right Connection

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 13 -

1  is not generating any revenues from business from the clublifestyle.com site, and has not earned a

2  single penny of revenue from such site in any way since 2006.

3      64.  Indeed, for all intents and purposes, the clublifestyle.com site is a dead site.  By Right

4  Connection's analysis, the site has very few visitors since February 2008 because Plaintiff

5  severely damaged the value of the site by not providing the credit card account as required by the

6  parties' contract.

7                                  The Desire Resorts

8      65.  Plaintiff's claim that it owns "common law" trademark rights in the names desire-

9  resort" and/or "desire-resorts" and that Right Connection supposedly is infringing Plaintiff's rights

10  in such names is preposterous.

11      66.  The names "desire-resorts" and "desire-resort" refer to the Desire Resorts, which are

12  two adult-orientated resorts located in Mexico.  [Exhibit G is a printout of the web pages for the

13  Desire Resorts that will provide more information about the resorts.]   The Desire Resorts are

14  owned and operated by a third party with no affiliation with Plaintiff and for which Plaintiff, Right

15  Connection and any other travel business can book travel.

16

17      67.  Certainly, neither Plaintiff, Right Connection nor any other travel service can claim

18  exclusive rights to the Desire Resorts name or variations thereof.  The owner of the rights to such

19  name is the owner and operator of the Desire Resorts themselves.

20                              Other Wrongful Conduct By Plaintiff

21      68.  In February of 2007, Plaintiff purchased the domain name of

22  RightConnectTravel.com, a slightly changed version of the common law trademark of

23  "RightConnectionsTravel.com" owned by Right Connection.  [See Exhibit H.]  The only logical

24  explanation for such purchase is so that Plaintiff can use such name to deceive and divert the

25  customers of Right Connection.

26      69.  Plaintiff also has violated Right Connection's copyright rights by using copyrighted

27  art and designs owned by Right Connection as content on the new website now being operated by

28

Plaintiff at the clublifestyles.com website.  Plaintiff has used such copyrighted materials even though the contract between Right Connection and Plaintiff (Exhibit B) specifically states that Right Connections owns all intellectual property rights in the materials it created for the ClubLifestyles websites.

<u>Right Connection Has Returned Plaintiff's Servers And Trip Cash Programming To Plaintiff</u>

70.  In February 2007, Right Connection decided to end the business relationship with Plaintiff.  Right Connection asked Plaintiff to remove their servers from the data center where Plaintiff's servers were collocated.  Right Connection provided Plaintiff approximately thirty days to remove their programs and equipment from the collocation center.  [See Exhibit I.]

71.  Although Right Connection gave Plaintiff ample time to move its servers to another location, Plaintiff chose instead to leave the servers in place and simply move the programs from Plaintiff's servers to other servers.  Of course, all Plaintiff had to do instead was unplug the servers from the collocation center and plug them back in at a new facility.

72.  After Plaintiff removed its programming from the servers, Right Connection removed the two servers from the rack and stored them at the collocation center awaiting Plaintiff to come pick them up as requested.  Plaintiff never came to pick up the servers.

73.  On February 28, 2008, to resolve any complaint by Plaintiff about the servers, Right Connection shipped the servers at Right Connection's own expense by Federal Express to Plaintiff's lawyer.  [See Exhibit J, which is the Federal Express receipt for the shipment of the servers to Plaintiff's counsel.]

74.  After Plaintiff removed its programming from the servers at the collocation center, Right Connection also informed Plaintiff to download and move the programming for their "Trip Cash" affiliate program from the Right Connection servers so Plaintiff could bring the program back up at the new facility it was using.  The program was downloaded by Plaintiff, i.e., returned to Plaintiff, on February 22, 2007 by David Valentiner, Plaintiff's webmaster.

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 15 -

75.  Right Connection does not have a copy of the Trip Cash program and does not use any portion of the Trip Cash program.  On the contrary, Right Connection had a completely new program written for use with Right Connection's Travel and Exotic Travel Mart affiliate program. There is no similarity at all between the programming code or the appearance of the Trip Cash program and Right Connection's Exotic Travel Mart.

<u>Plaintiff Is Seeking A TRO For An Improper Purpose</u>

76.  I personally attended, on behalf of Right Connections a creditor of Plaintiff, the first creditors' meeting in Plaintiff's bankruptcy.  I was sitting no more than six feet from Mr. McGinley at this meeting and he generally was looking right at me as he looked upon the audience at the hearing.

77.  When the bankruptcy trustee interviewed Robert McGinley under oath in reference to Plaintiff's bankruptcy, the first question was "Why is your company here in bankruptcy -- what is the reason for the financial problems of the company?"  Mr. McGinley testified under oath the reasons for the bankruptcy were – 1) Hurricane Wilma 2) Breach of contract between Plaintiff and (ironically) Desire Resorts , and 3) Poor bookkeeping practices.  [See also Exhibit K, Plaintiff's bankruptcy status report and explanation of reasons for bankruptcy.]

78.   On numerous occasions during this hearing, Mr. McGinley was asked whether there was any other reason why Plaintiff was in serious financial condition.  On no occasion did Mr. McGinley mention during this line of questioning that there was any problem with me or Right Connection, or any issue of trademark infringement, misuse of customer lists or diversion of business by Right Connection.

79.  At the end of the bankruptcy proceeding, I was allowed time to ask Mr. McGinley questions relating to the bankruptcy. This infuriated Mr. McGinley.  On the way out of the hearing room, Mr. McGinley stated loudly that he would "go after those guys with a vengeance."  As evidenced by this proceeding, he has been true to his word.

80.  Plaintiff's bankruptcy filing also reveals other information that is of critical importance in this matter.  As shown in Plaintiff's schedule of unsecured creditors [Exhibit L], Plaintiff owes the sum of $460,595.55 to Desire Resort, which of course raises the separate question as to why Plaintiff is complaining about Right Connection's use of the Desire Resorts name to book travel when Desire Resort presumably will not do business with Plaintiff given Plaintiff's bankruptcy filing and massive amount that Plaintiff already owes to Desire Resort.  Plaintiff's bankruptcy schedule also reveals that Plaintiff owes the sum of $310,000.00 to Tuscany Hotel and Casino in Las Vegas.

81.  The foregoing sums represent monies that Plaintiff owes the resorts for guests who were booked through Plaintiff and stayed at the resorts.  Plaintiff was supposed to keep the customer payments in a trust account for payment to the resorts but obviously did not do so.

82. By failing to keep customer payments in a trust account for payment to Desire Resort and Tuscany Hotel, Plaintiff has violated California law governing travel agents by using customer prepayment funds for reasons other than payment for the customer travel.  Because of such blatant violation of California law, Plaintiff's travel agent permit is subject to revocation, which of course would doom Plaintiff's to emerge from and continue in business following bankruptcy.

/././

/././

/././

/././

/././

/././

/././

/././

/././

_DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION_

- 17 -

<u>Damage To Right Connection From TRO</u>

83.  Right Connection generates gross sales close to $200,000.00 per month from its services, sales of goods, websites, and related services.  If the Court were to grant the injunction sought by Plaintiff with respect to the customer lists, use of the "desire-resort" domain name, or the unspecified "unfair business practices," Right Connections' business would be seriously disrupted.  Consequently, if the Court grants Plaintiff's TRO motion, Right Connection requests a bond in the amount of at least $200,000.00.


I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 12, 2008 at Lake Havasu, Arizona.


_____

Donald Hughes

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 18 -

1

## Certificate of Service

2
3

The undersigned hereby certifies that on this 12th day of March 2008, a true and accurate copy of the attached document was electronically filed with the Court, to be served by operation of the Court's electronic filing system, upon the following:

4
5
6
7

Paul S. Murray
Ariel J. Sabban
Murray & Sabban LLP
140 Marine View Avenue, Suite 116
Solana Beach, CA  92075
Attorneys for Plaintiff

8
9
10

*/s/ Gregory P. Goonan*

Gregory P. Goonan

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*

- 19 -

<u>Damage To Right Connection From TRO</u>

83.  Right Connection generates gross sales close to $200,000.00 per month from its services, sales of goods, websites, and related services.  If the Court were to grant the injunction sought by Plaintiff with respect to the customer lists, use of the "desire-resort" domain name, or the unspecified "unfair business practices," Right Connections' business would be seriously disrupted.  Consequently, if the Court grants Plaintiff's TRO motion, Right Connection requests a bond in the amount of at least $200,000.00.


I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 12, 2008 at Lake Havasu, Arizona.


_____
Donald Hughes

---

*DECLARATION OF DONALD HUGHES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TRO AND WRIT OF POSSESSION*