**MURRAY & SABBAN, LLP**
Lomas Santa Fe Professional Building
140 Marine View Avenue, Suite 116
Solana Beach, CA 92075
Telephone (858) 259-8052
Telecopier (858) 259-8055
pmurray@murrayandsabban.com
Paul S. Murray, SB# 158280
Ariel J. Sabban, SB# 189414

Attorneys for Plaintiff LSO, LTD.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LSO, LTD. a California Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> DONALD D. HUGHES; RIGHT CONNECTION, INC., a Nevada corporation; and DOES 1 through 20 inclusive, <br><br> Defendants. | Civil Action No.: 3:08-cv-00329 H (LSP) <br> Judge: Hon. Marilyn L. Huff <br> Courtroom 13 <br><br> **DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO LTD.'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S COMBINED MOTION FOR INJUNCTIVE RELIEF** <br><br> [Filed Concurrently with Plaintiff's Reply to Defendants' Opposition to Injunctive Relief] <br><br> Date: March 17, 2008 <br> Time: 10:30 a.m. |

## DECLARATION OF ROBERT McGINLEY

I, Robert McGinley, declare:

1. I am the President and Chief Executive Officer of the Plaintiff, LSO, Ltd. I have person knowledge of the facts set forth below and am willing and able to testify truthfully to the matters set forth.

2. I have reviewed the declaration of Mr. Don Hughes offered in support of his opposition to LSO's motions for Temporary Restraining Order and Preliminary Injunction. I take exception to the specific characterizations set forth therein, both as to fact and chronology. I

DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO'S REPLY TO OPPOSITION; Case No.3-08-CV-00329 H LSP;

1  provide the following specific disagreements regarding facts that are within my capacity as
2  President and CEO of LSO, Ltd.
3  3.   In response to paragraph seven (7) of Mr. Hughes' declaration, Right Connections, Inc
4  (RCI) and Mr. Hughes registered url www.desire-resort.com following LSO's registration of
5  www.desire-resorts.com. LSO suffered loss of client reservations as a direct result of
6  www.desire-resort.com when LSO clients typed the url incorrectly, omitting the "s" on
7  "resorts." This was complicated by David Valentiner giving RCI an exact copy of LSO's Desire
8  web site. LSO paid Mr. Valentiner to design this site. Mr. Valentiner was not given permission
9  to give this design to RCI. RCI utilized a copy of this web design on www.desire-resort.com
10 with clients of LSO believing that they were contacting LSO. Once the copy was discovered I
11 repeatedly asked Hughes to give www.desire-resort.com to LSO and, failing to do this, not use
12 the copy of LSO's Desire web design.
13 4.   In response to paragraph nine (9) of Mr. Hughes' declaration, LSO believes that RCI
14 developed its claimed email list from hosting the web sites of others, including LSO's sites
15 hosted by RCI, couplesexchange.com, Connection Magazine's ConnectionOnline and others.
16 RCI has not had direct contact with swing organizations to LSO's knowledge.
17 5.   In response to paragraph ten (10) of Mr. Hughes' declaration, this was a Lifestyles
18 Convention and was never at any time promoted as a "swinger" convention. Mr. Hughes
19 contacted me, not the other way around, to suggest developing an Internet personals and chat
20 site. ConnectionOnline was developed for Connection Magazine and was owned by Connection
21 Magazine (editor Patty Thomas).
22 6.   In response to paragraph eleven (11) of Mr. Hughes' declaration, Patty Thomas, editor
23 of Connecion Magazine, objected to LSO working with RCI using the personals and chat
24 program developed for ConnectionOnline. I then asked Digital Computer Design, Inc. to do this
25 programming. LSO did not sign or make an agreement with RCI and is unaware of any expense
26 claimed by RCI.
27 7.   In response to paragraph fourteen (14) of Mr. Hughes' declaration, I have reviewed the
28 purported memo of David Valentiner's and finding much of it to be his unsupported opinion

and other parts to not be correct or according to my recollection. Furthermore, LSO was unaware that Mr. Valentiner was working with RCI while also working for LSO. Mr. Valentiner failed and refused to return the property of LSO upon his cessation of work with LSO based upon his association with RCI.

8. In response to paragraph fifteen (15) of Mr. Hughes' declaration, LSO and RCI signed an agreement whereby LSO would own the url, name, logos and data. LSO and RCI would equally share in the gross income from subscriptions to ClubLifestyles.

9. In response to paragraph nineteen (19) of Mr. Hughes' declaration, LSO never granted ownership to RCI. RCI did have control of this url and refused to surrender it to LSO when asked. RCI later used this control to shut out LSO and LSO's ClubLifestyles members from the site, even though ownership was LSO's.

10. In response to paragraph twenty-one (21) of Mr. Hughes' declaration, ) LSO did not have access to the code for clublifestyles.com or clublifestyle.com one the sites were operated by RCI. LSO did not have the ability to make substantive changes to the site without RCI performing the changes.

11. In response to paragraphs twenty-three and twenty-four (23,24) of Mr. Hughes' declaration, LSO agrees that RCI had considerable knowledge and ability in programming and use of the Internet. RCI was paid by LSO because of this knowledge and ability by sharing income from the personals and chat site owned by LSO and also for developing the unique TripCash program for LSO. It is RCI's collection of LSO's data and use of this data, plus RCI's actions against LSO and members of ClubLifestyles that LSO objects to. RCI's knowledge or access to this knowledge made RCI's actions possible.

12. In response to paragraphs twenty-five and twenty-six (25,26) of Mr. Hughes' declaration, LSO did not consider RCI to be in the travel business. RCI did not have an ARC (Airline Reporting Corporation) appointment, was not, to LSO's knowledge, bonded as required by ARC, was not affiliated with IATA or IATAN, and was not a member of the California Seller of Travel Law. LSO did not want RCI to be a competitor in its travel business.

DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO'S REPLY TO OPPOSITION: Case No.3-08-CV-00329 H LSP.

1  LSO did agree, recognizing the reality that RCI was selling travel, to pay RCI commissions for
2  travel RCI processed through LSO (LT&T).
3  13.    In response to paragraphs twenty-nine to thirty-one (29-31) of Mr. Hughes' declaration,
4  a number of LSO's clients, including attorney Clyde DeWitt, claimed that they have received e-
5  mail solicitations from Right Connection Travel to an email address they stated had been
6  provided to LSO only.
7  14.    In response to paragraphs thirty-five to thirty-eight (35-38) of Mr. Hughes' declaration,
8  LSO agreed to share with Hughes equally in gross income from subscriptions to
9  ClubLifestyles.com. LSO confirmed with RCI and Mr. Hughes that all outstanding payments
10 on commissions earned had been paid. Based upon RCI's confirmation of payment, LSO has no
11 outstanding debt to RCI.
12 15.    In response to paragraph forty (40) of Mr. Hughes' declaration, LSO paid RCI
13 approximately $45,000 to develop the TripCash and Adult Travel Store programming.
14 16.    In response to paragraph forty-two (42) of Mr. Hughes' declaration, Opinion and
15 misstatement. LSO paid all commissions that were earned. LSO did not agree with RCI on
16 TripCash policy or that he had any business dictating how LSO operated its business. LSO did
17 object to RCI taking bookings from LSO's regular clients.
18 17.    In response to paragraphs forty-four to forty-six (44-46) of Mr. Hughes' declaration,
19 Mr. Hughes rightly states that he developed a travel business from working with LSO. This was
20 objected to by LSO who considered RCI's action as a conflict of LSO's business association
21 with RCI. RCI would not agree with LSO's objection and proceeded against the dictates of
22 LSO. RCI was able to convince Laura Flores, a business contact of LSO for the owners of
23 Desire Resorts, to grant it a travel wholesaler's contract. Because of LSO business with RCI in
24 developing the travel TripCash and Adult Travel Store Internet sites LSO saw this development
25 as a conflict of interest and a threat to its travel Business. (Desire Resorts violated its agreement
26 with LSO which stated that all lifestyles business was to be through LSO. Desire did back down
27 on other violations, such as NFN Travel, but would not discuss the Hughes/Right Connections
28

DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO'S REPLY TO OPPOSITION; Case No.3-08-CV-00329 H LSP;

Travel issue. LSO attempted to discuss this issue with Desire Resort owners only, and not with any other resort as Hughes implies.

18. In response to paragraphs forty-seven and forty-eight (47,48) of Mr. Hughes' declaration, ClubLifestyles was successful in that gross income averaged approximately $5,000 per month to the best of my recollection.

19. In response to paragraph forty-nine (49) of Mr. Hughes' declaration, As stated, Bruce Kinnee, Dixie Kinnee and RCI did discuss making ClubLifestyles a "portal" to all of LSO's business, making it a free instead of a pay site. I was not in agreement with this stating that it made no sense to give up income on the one hand and later attempt to revert to a pay site. I did not agree to this plan, especially a reversion after a specific period. It appeared to me that the only logical reason Hughes wanted to do this was as a means to attract more clients to his travel site.

20. In response to paragraph fifty-three (53) of Mr. Hughes' declaration, RCI did offer the stated three options but did not state that option one included payment to RCI of $5,000 per month. My statement was that we revert to our signed agreement to operate the site as originally intended as a pay site with equal sharing of the gross income. This agreement had yet a year to run. It was evident to me that RCI wanted ClubLifestyles to promote their new travel business, a business they knew LSO objected to. RCI would not consider honoring the signed agreement.

21. In response to paragraphs fifty-four to fifty-six (54-56) of Mr. Hughes' declaration, LSO did not chose any option other than reversion to the original agreement. Bruce Kinnee did email RCI a tentative agreement to RCI's option three. This was not LSO's agreement and I rejected it as soon as I became aware of it, informing RCI that Mr. Kinnee was free to offer suggestions but I had the final say. This statement in Mr. Hughes' declaration amply proves my contention that the real reason RCI went along with the free use of ClubLifestyles was to further their incursion into the travel business. RCI wanted our clients as stated here.

22. In response to paragraphs fifty-six to sixty-one (56-61) of Mr. Hughes' declaration, this is in its entirety is a gross misstatement of fact. Mr. Hughes became angry and told me that

immediately he was going to shut ClubLifestyles down. This he did with a false statement sent to members and posted on the site that Lifestyles had demanded that all members now pay. No provision was made for members to pay should they so choose. All members were prevented from access to all but the main page of ClubLifestyles. LSO was also prevented from access to ClubLifestyles. RCI hijacked ClubLifestyles, a site they did not own, because RCI, as Internet provider, had such control.

23. In response to paragraphs sixty-two and sixty-three (62.63) of Mr. Hughes' declaration, I had discussed ClubLifestyles with Mr. Valentiner several times once RCI shut the site down. At no time did Mr. Valentiner state that he had any control or ability to help LSO put ClubLifestyles back into operation. LSO remained shut out of this site by the unilateral action of RCI

24. In response to paragraph sixty-four (64) of Mr. Hughes' declaration, Contrary to Mr. Hughes' statement' ClubLifestyles was damaged by RCI's unauthorized and deliberate shutting down and misstatement to ClubLifestyle members. LSO attempted to resurrect this site but not having access and the ability to use the original programming created a similar but less robust site. The members were long gone though and most did not return. Many still blame LSO for the loss of a site they enjoyed.

25. In response to paragraphs sixty-five to sixty-seven (65-67) of Mr. Hughes' declaration, by agreement signed by LSO and Desire Resorts, LSO was charged with setting up a web site to promote what was then a new resort concept. To accomplish this requirement LSO bought the domain www.desireresorts.com. Patricia de la Pena, daughter of the owner of Desire Resort, Diego de la Pena and Vice President of Blue Bay Resorts in Cancun Mexico, demanded that LSO turn ownership of this domain to her. Mr. Valentiner argued that we keep the domain but I agreed to the transfer and LSO bought www.desire-resorts.com to build as the required web site. LSO has the common law trademark in desire-resorts.com as LSO was the first to use it in commerce. Mr. Valentiner then created the site for LSO. RCI subsequently, without LSO's knowledge, bought www.desire-resort.com and placed an exact copy of the LSO website on the Internet which caused consumer confusion. LSO is aware that numerous LSO clients have

purchased travel to Desire from RCI under the mistaken belief that they were doing business with LSO.

26. In response to paragraphs sixty-eight and sixty-nine (68-69) of Mr. Hughes' declaration, LSO at all times sought to protect its business from RCI. Mr. Hughes' argument is in effect admission that his earlier and continued use of ClubLifestyle.com and Desire-Resort.com was in violation of LSO domains and an attempt to divert LSO clients to RCI.

27. In response to paragraphs seventy to seventy-three (70-73) of Mr. Hughes' declaration, RCI at all times refused to return LSO servers in its possession. Mr. Bruce Kinnee flew from Florida to Southern California specifically to drive to the San Diego area to retrieve these servers. RCI refused to return the servers to Mr. Kinnee.

28. In response to paragraphs seventy-six to seventy-nine (76-79) of Mr. Hughes' declaration, Mr. Hughes, though not a creditor, attended the bankruptcy hearing in the Federal Court in Santa Ana, California. He was not specifically named as a reason for filing Chapter 11. During the creditor questioning period Mr. Hughes asked to be seated to ask questions. He proceeded to ask personal questions of me such as my personal IRS filings. The trustee/judge told Mr. Hughes that he must ask questions regarding LSO's bankruptcy only, that I was not in bankruptcy. While I am opposed to Mr. Hughes' actions, I did not say that I "would 'go after those guys with a vengeance'."

29. In response to paragraph eighty (80) of Mr. Hughes' declaration, Desire resorts and LSO continue to do business. LSO has not defaulted on any clients booking Desire resorts through LSO. Desire continues to accept LSO bookings and payments. Any payment to Tuscany or other creditor is in the control of the court.

///
///
///
///
///
///

DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO'S REPLY TO OPPOSITION: Case No.3-08-CV-00329 H LSP:

30. In response to paragraphs eighty-one and eighty-two (81-82) of Mr. Hughes' declaration, Mr. Hughes has no knowledge of LSO's business operations whatsoever and his opinions have no weight. He is, simply put, wrong in these statements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct that the foregoing is true and correct and that this declaration was executed this 13 day of March 2008.

Robert McGinley

DECLARATION OF ROBERT McGINLEY IN SUPPORT OF LSO'S REPLY TO OPPOSITION; Case No.3-08-CV-00329 H LSP;